**HORMEL FOODS CORPORATION,**
Plaintiff,

v.

**NORTHBROOK PROPERTY AND CASUALTY INSURANCE COMPANY, Defendant.**

No. 3–96–135.

United States District Court,
D. Minnesota,
Third Division.

Sept. 23, 1996.

David Carl Forsberg and Karna A. Berg, Briggs & Morgan, St. Paul, MN, for plaintiff.

Brian Alan Wood and John M. Bjorkman, Rider, Bennett, Egan & Arundel, L.L.P., Minneapolis, MN, for defendant.

## MEMORANDUM AND ORDER

DAVIS, District Judge.

## INTRODUCTION

This is a declaratory judgment action pursuant to 28 U.S.C. § 2201, *et seq.* Presently before the Court are cross-motions for summary judgment respecting the rights and obligations of the parties under a contract of insurance. For the following reasons the Court GRANTS in part and DENIES in part both motions.

## BACKGROUND

This case arises from a fatal accident sustained by an employee of Quality Pork Products (QPP), which is not a party to this action. Plaintiff Hormel leases a hog processing facility to QPP. The facility was constructed in 1982, and includes a carcass-splitting machine which is fixedly attached to the premises, and which was designed and manufactured by Hormel in 1985. The facili-ty's sole function is the slaughter and processing of hogs, and the lease agreement executed between QPP and Hormel in 1989 provides that all machinery, equipment and fixtures are made a part of the lease, and are included in the definition of "Leased Premises." *See* Exh. A to the Affidavit of Richard C. Knight, at 1. As part of the lease agreement, QPP caused Hormel to be included as an Additional Insured on QPP's liability policy with Defendant Northbrook Insurance. This policy covered losses "arising out of the ownership, maintenance or use" of the leased premises. *See* Exh. C. to the Affidavit of John M. Bjorkman. The decedent was fatally compressed by the splitting machine. The ensuing wrongful death action charges Hormel with negligently designing the machine. It does not state a claim against Hormel in its capacity as owner of the premises.

Northbrook has rejected Hormel's tender of defense. Northbrook asserts several reasons why, despite the fact that it issued a policy covering Hormel, it is nevertheless free to do so. Northbrook argues that because the suit arises from Hormel's *equipment,* it does not arise out of Hormel's ownership, maintenance, or use of the premises. Northbrook refines this argument by also claiming that the additional insured provision only protects Hormel from the negligence of QPP, an issue not contemplated in the underlying products liability action. Finally, Northbrook takes the position that it has not provided *primary* insurance to Hormel, because Hormel has retained a $1,000,000 self-insured limit. Because of this retention, Northbrook concludes, Hormel itself should be considered the "primary insurance" to which Hormel should look for payment. At most, Northbrook suggests that it is required only to share in the defense costs pro-rata.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980

F.2d 1217, 1219–20 (8th Cir.1992). The Court determines materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts which might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. at 2510–11.

### II. "Arising Out Of"

■ Northbrook does not persuasively explain why, under the facts presented here, the claim against Hormel lies outside the scope of coverage provided. Northbrook relies on the "mere situs" rule, which precludes coverage for injuries which merely happen to occur on covered premises, as opposed to those which "arise" out of the premises:

> Thus the premises must bear some causal relationship to the liability. Such a relationship is apparent when a claimant trips over improperly maintained steps. The fact that something occurs at a place is not sufficient by itself to imply causation as to that place.

*Lanoue v. Fireman's Fund American Insurance Cos.*, 278 N.W.2d 49, 54 (1979).

■ This standard is not one of proximate causation. *Progressive Casualty Ins. Co. v. Brockway*, 411 N.W.2d 13, 16 (1987). Rather, "but for" causation satisfies the requirements of an insurance policy which specifies that only liabilities "arising out of the use" are covered. *Id.* Therefore, if there is a causal relationship between the place covered by insurance and the acts giving rise to legal liability, the liability is covered also. Two cases from the automobile context illustrate the reach of this doctrine.

In *Waseca Mut. Ins. Co. v. Noska*, 331 N.W.2d 917 (1983) an insured transported a load of smoldering embers in his truck. During his six-mile trip, and unbeknownst to him, the embers were fanned by the winds and alighted from truck, setting fires which eventually destroyed numerous farms and residences. Reversing a judgment in favor of the insurer, the Minnesota Supreme Court held that while the losses partly originated in the non-vehicular acts of the insured in loading the truck, they were also causally related to the use of truck to tow the embers. 331 N.W.2d at 920. Thus, the truck could be said to have been an "active accessory" to the injury sustained. *Id.* Noting that "each case presenting such a question must, to a great degree, turn on the particular facts presented," the court concluded that the fires had "arise[n] out of the use of a motor vehicle." *Id.*

Relying on *Waseca*, the Minnesota Court of Appeals reached the same conclusion in *Jorgensen by Jorgensen v. Auto–Owners Ins. Co.*, 360 N.W.2d 397 (Minn.Ct.App.1985). The policyholder in *Jorgensen* had placed several cans of gasoline in his trunk. When his son opened the trunk, a frayed wire connected to the trunk light caused a spark or explosion which ignited the gasoline and severely burned the son. The court noted that but for the defective condition of the trunk wiring, the explosion would not have occurred. 360 N.W.2d at 400. The court further observed that Minnesota courts have uniformly held that where an injury is caused by the condition of the vehicle or because the vehicle itself malfunctions, the causal connection between the injury and the use of the vehicle is met. *Id.* Applying this standard, the court found that the vehicle was more than the "mere situs" of the accident; it was an "active accessory" to the injury sustained for which there was coverage under the policy. *Id.*

■ With these rules in mind, the Court must conclude that the carcass-splitting machine was so intimately and necessarily intertwined with the facility's operations as to make injuries flowing from it attributable to the "ownership, maintenance, or use" of the facility. The machine was hardly a stranger to the facility's business. Rather, it was literally part of the operation, set in concrete tubing and integrated into the facility's hydraulics. *See* Affidavit of Larry E. Helsene, para. 6(L). Even without the lease's designation, the machine which killed the decedent could hardly be considered anything other than part of the "leased premises".

Northbrook tries to evade these facts by suggesting that the machine was merely a "structural alteration" or "new construction" for which there is no coverage under the policy. This argument borders on the frivolous. The machine in question was fixedly incorporated into the facility by 1986, some eight years prior to the issuance of the policy. Northbrook's "mere situs" argument also rests on the fact that the underlying claim is a products liability claim against Hormel as manufacturer, rather than one sounding in premises liability. This does not aid Northbrook's cause. Northbrook has identified no exception in the sweeping language of the policy relating to products liability claims. While Hormel might conceivably have designed and manufactured equipment whose liability-causing presence at the facility would have been mere happenstance (a hand-held saw, perhaps), that is not the case here. Instead, Hormel designed and manufactured a machine which bolted into the floor and walls of the facility. It is unambiguously part of the premises. Because there is a clear causal connection between the premises (including the machine) and the injury, the injury "arises out of" the use of the premises under Minnesota law.

III.   Direct Liability of Additional Insured

■   Northbrook's next argument regarding the asserted limitation of coverage to only those acts for which Hormel is vicariously liable is likewise unsupported. Northbrook relies on a line of cases which appear to hold that additional insured endorsements such as the one at issue here provide only limited coverage—that is, they do not cover acts for which the additional insured-lessor is directly liable, but only those for which it is vicariously liable for the acts of the primary insured-lessee. Noting that Hormel has not been sued for the negligence of QPP, but rather its own alleged failings in designing the machine, Northbrook concludes that Hormel is not entitled to coverage.

After carefully considering the authorities submitted by Northbrook, the Court concludes that they do not support Northbrook's position. Northbrook points to *U.S.F. & G v. Drazic*, 877 S.W.2d 140 (Mo.Ct.App.1994), in which a commercial tenant leased a portion of the premises from the landlord, and named the landlord as an additional insured. Both landlord and tenant operated separate businesses from their respective portion of the premises. An employee of the tenant was injured when she slipped and fell in a parking lot near the premises. The employee alleged that the landlord, who operated a dry-cleaning operation, had negligently discharged steam which froze over the parking lot, making it slippery. The landlord, after resorting to its own insurer first, tendered its defense to the tenant's insurer under the additional insured endorsement.

The additional insured provision at issue in *Drazic,* as here, expressly limited coverage to liability arising out of the leased portion of the premises. Based on this, the court explained why coverage was absent. First, the court observed that the parking lot was not part of the premises leased to the tenant. The court then made the following statement, on which Northbrook relies:

> The purpose of additional insured endorsements obtained in a landlord-tenant context is to provide landlords with protection from vicarious liability due to a tenant's action which takes place on the premises that the tenant has leased (citation omitted). The additional insured endorsements in these settings are meant to provide specialized protection rather than all-encompassing coverage. Such a purpose is evidenced in this case by the dramatically lower premium for the additional insured endorsement, $72 per year, as opposed to the premium for the [landlord's] main coverage, $333 per year.

877 S.W.2d at 143.

However, the grounds upon which the *Drazic* court resolved the question before it did not involve the question of the landlord's vicarious liability: "The injury to Leary occurred due to alleged negligence on the part of the landlords' business ... *and did not occur on the premises leased to the [tenants]*" (emphasis supplied) In light of this conclusion, the limitations described above are best understood not as relating to whom is responsible for the injury, but where it took place. The endorsement was less ex-

pensive because it covered only a portion of the premises—the space leased to the tenant. The acts giving rise to liability had nothing to do with the leased premises. This fact, rather than the fact that liability was direct instead of vicarious compelled the court's conclusion that there was no coverage.

This conclusion is also supported by *Northbrook Ins. v. American States Ins. Co.,* 495 N.W.2d 450 (Minn.Ct.App.1993), a case cited in the *Drazic* opinion and relied upon by Northbrook here. In *American States,* a bakery employee slipped and fell in an alley which while not part of the demise, was required to be maintained by the bakery under its lease. The employee sued the bakery's landlord, alleging that the alley had been negligently maintained. As here, the bakery had named the landlord as an additional insured.

The court stated that, "[o]ne of the primary functions of the additional insured endorsement is to protect the additional insured from vicarious liability for the acts of the insured." 495 N.W.2d at 453. (citing *Harbor Ins. Co. v. Lewis,* 562 F.Supp. 800, 803 (E.D.Pa.1983)). The court then described the question before it as "whether [the] liability arises out of a hazard associated with the named insured's business." *Id.* At 453. Noting that the insurance covered liability arising out of the ownership, maintenance, or use of the leased premises, the court concluded that, "[b]y its terms, the endorsement provided coverage for [the landlord's] negligence *in the bakery.* Coverage is not provided for the rest of the Texa–Tonka Shopping Center." (Emphasis in original).

This conclusion is simply inconsistent with the broad rule of limited liability which Northbrook seeks. If, as Northbrook suggests, *American States* holds that only vicarious liability is covered by an additional insured endorsement, then the *American States* court must have been incorrect when it stated that the landlord would have been covered for its own acts of negligence, as long as they occurred in the bakery. This Court doubts that *American States* was so Janus-faced. Rather, as in *Drazic,* the operative fact was that the acts giving rise to

liability did not take place on the leased (that is, insured) premises.

Finally, the Court notes that the case upon which Northbrook principally relies, and from which the above cases are descended, involved an insurance contract materially different from the one at issue here. Defendant points to language in *Harbor Ins. Co. v. Lewis,* 562 F.Supp. 800, 803 (E.D.Pa.1983) which suggests that by providing additional insured endorsements, "the insurer is only insuring the additional insureds against vicarious liability for the acts of the named insured." As Hormel convincingly demonstrates, Northbrook has misconstrued this case. The disputed policy in Harbor Insurance specifically provided additional insured coverage only for the negligent acts of the principal insured:

> IT IS AGREED THAT THE INSURANCE AFFORDED BY THIS POLICY SHALL APPLY TO THE FOLLOWING ADDITIONAL INSUREDS BUT ONLY TO THE EXTENT OF LIABILITY RESULTING FROM OCCURRENCES ARISING OUT OF THE NEGLIGENCE OF [PRINCIPAL INSURED] AND OR ITS WHOLLY OWNED SUBSIDIARIES.

*Harbor Insurance,* 562 F.Supp. at 802.

Significantly, no such limitation appears in the endorsement provided here by Northbrook. Moreover, the same court which decided *Harbor Insurance* later responded as follows to an argument identical to the one Northbrook makes here:

> [*Harbor Insurance* ] did not, as defendants suggest, articulate a rule of law limiting the interest of an additional insured on a comprehensive general liability policy to those cases in which it is vicariously liable from the acts of the primary policyholder
> . . .
> The contract language in this case contemplates a wider scope of coverage than the language in Harbor. If the parties had intended coverage to be limited to the vicarious liability type suggested by the defendants, language clearly embodying that intention was available—that is the lesson of Harbor. Here, the language of

the Certificate of Insurance should be read to include all liability arising in connection with [the contractor's] work, including [the purchaser's] own negligence.

*Philadelphia Electric Co. v. Nationwide Mut. Ins. Co.,* 721 F.Supp. 740, 742 (E.D.Pa. 1989). This analysis is fully applicable here. If Northbrook had intended to limit coverage to Hormel's vicarious liability, it could have done so. It did not.

### IV. Effect of Self–Insured Retention

■ Finally, Northbrook argues that Hormel has a $1,000,000 self-insured retention, which is "in effect, a large deductible[ ]." *See* Allan D. Windt, *Insurance Claims and Disputes,* § 11.31 at 348 (3d ed.1995). Northbrook argues that Hormel should look primarily to its own retention for reimbursement, and that Hormel is required to share in costs of defending the underlying action.

Hormel, while apparently conceding that it normally retains the first $1,000,000 of risk, argues that the additional endorsement here provides it with primary coverage. This is, demonstrably incorrect. The endorsement clearly provides excess coverage, as evidenced by the "Limits of Liability" section on the "Declarations" page:

> The limit of the Company's liability shall be as stated herein subject to all the terms of this policy having reference thereto:
>
> A. $10,000,000. Single Limit any one occurrence Personal Injury or Property Damage or Advertising Liability or any combination thereof *in excess of*
>
> (1) the amount recoverable under the underlying insurance as set out in the attached Schedule A[.]

*See* Exhibit E to the Affidavit of John M. Bjorkman, dated May 14, 1996 (emphasis supplied).

Schedule A lists various underlying insurance policies for the different types of risk for which umbrella or excess coverage is provided. *See* Bjorkman Aff.Exh.F. Under Comprehensive General Liability, the Schedule states that Hormel is self-insured for

$1,000,000 per occurrence. Therefore, Northbrook's coverage is not primary. *Id.*

■ However, this does not address the question of who is responsible for paying the costs of Hormel's defense prior to the exhaustion of the $1,000,000 limit. Hormel argues that its retention may not be considered primary insurance to which Northbrook may insist it look first for the costs of defense.[1] It is generally true that a self-insured retention does not constitute "insurance". Windt, § 11.31 at 348; *3M v. H & W Motor Express Co.,* 507 N.W.2d 622 (Minn.Ct.App.1993); *Truck Ins. Exchange v. Amoco Corp.,* 35 Cal.App.4th 814, 41 Cal.Rptr.2d 551 (1995). However, this does not make the excess insurer responsible for the costs of defense up to the retained limit: "The difference between a self-insured retention and a deductible is usually that, under policies containing a self-insured retention, the insured assumes the obligation of providing itself a defense until the retention is exhausted." Windt, § 11.31 at 348. This is precisely the result which courts addressing these facts have reached. *See Aerojet–General Corp. v. Transport Indemnity Co.,* 45 Cal.App.4th 1192, 53 Cal.Rptr.2d 398 (1996) (where entity makes business decision to retain portion of risk, no duty to defend exists until retention limits are exhausted); *Nabisco v. Transport Indemnity Co.,* 143 Cal.App.3d 831, 192 Cal. Rptr. 207, 210 (1983) (court would create a "serendipitous windfall" for insured were it to permit it to avoid consequences of its risk management decision).

The Court notes that the policy itself describes the Schedule A coverages (including the various self-retained coverages) as "underlying insurance." Bjorkman Aff.Exh.E. Whether this is true for all purposes is not before this Court; it is enough to say that the cases and authorities confirm that it is true enough with respect to Northbrook's duty to defend. The cases cited by Hormel do not conflict with this analysis. Hormel cites a snippet from *H & W Motor's* conclusion that "the retained limit of [the insured]

---

1. Schedule A states that "Expenses including defense are in addition to the [self-insured retention]." Bjorkman Aff.Exh.F. The Court interprets this language to mean that in determining whether the $1,000,000 threshold has been reached, costs incurred in defending the action are to be considered separately. This suggests that the costs will be borne by Hormel itself.

is not coverage; it is an obligation of [the insured] under the terms of its insurance contract." 507 N.W.2d at 625. However, the discussion which precedes this conclusion dispels the suggestion that it is applicable here. At issue in *H & W Motor* was whether a carrier which paid uninsured motorist benefits to a claimant injured by H & W's negligence could "step into the shoes" of H & W's insolvent carrier. H & W's policy with its carrier provided that H & W would retain the first $25,000 of liability; the claimant's carrier requested that this amount be paid to it, since it effectively took the place of H & W's insolvent carrier. The Minnesota Insurance Guaranty Association Act, Minn.Stat. § 60C.09(2), precluded recovery against the insured of an insolvent insurer "except to the extent that the claim is outside the coverage of the policy issued by the insolvent insurer." 507 N.W.2d at 624. Therefore, when the court states that the retained limit is not coverage, it refers to the fact that a self-insured retention is not insurance *provided by the excess carrier.*

*Truck Insurance Exchange* is equally unavailing to Hormel. Plaintiffs in *Truck Insurance Exchange* sought to hold Amoco responsible for liabilities incurred by its former subsidiary for a period during which Amoco and its subsidiaries each retained the first $5,000,000 of risk. The court found no evidence that Amoco actually provided insurance to its subsidiaries. 41 Cal.Rptr.2d 551 at 558. Rather, it simply required them to self-insure to the specified limit. It is in this context that the court's observation that "[a]n entity which self-insurers is not an insurer" arose. *Id.* at 556. While this may be true, it does not relieve Hormel of the consequences of its risk management decision to retain $1,000,000 of risk here. The Court concludes that Northbrook has no obligation to defend Hormel until its coverage is triggered by exhaustion of Hormel's retained limit.

## ORDER

Based on the foregoing, and all the files, records and proceedings herein, IT IS HEREBY ORDERED:

1. Plaintiff's motion for summary judgment is GRANTED with respect to the following:
   a. The incidents giving rise to *Lyons–Leoni v. Hormel,* No. CX–95–1146 (Mower Cty.Dist.Ct.) arose out of the ownership maintenance or use of the leased premises;
   b. Policy No. BPP0506443 provides coverage for the acts of plaintiff as additional insured;
2. In all other respects, plaintiff's motion is DENIED.
3. Defendant's motion for summary judgment is GRANTED with respect to the following:
   a. Defendant has no obligation to defend or indemnify plaintiff unless and until plaintiff's $1,000,000 self-insured retention is exhausted.
4. In all other respects, defendant's motion is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.